BOARD OF EDUCATION, EAST IRONDEQUOIT CENTRAL SCHOOL DISTRICT, et al., Appellants, v JOHN DOE et al., as Owners of Real Property in the Ridgewood Subdivision, Town of Irondequoit, Respondents.

Fourth Department, July 9, 1982

### APPEARANCES OF COUNSEL

*Barrett, Maier and Barrett, P. C. (Dennis T. Barrett* of counsel), for Board of Education, appellant.

*Joseph Kaufman (Mayberry, Kurlander, Burgess, Lich & Lunn* of counsel), for Elmore J. Meitzler, appellant.

*Merkel & Mittleman (Jeanne Colombo* of counsel), for Thomas L. Jones and another, respondents.

*J. Webb L. Sheehy* for Reginald J. Page and others, respondents.

### OPINION OF THE COURT

MOULE, J.

Plaintiffs appeal from a dismissal of their complaint in an action brought under RPAPL 1951 to extinguish restrictions on the use of real property owned by them which they have contracted to sell to Wegman's Enterprises, Inc.

(Wegman). Plaintiffs' property consists of 20 lots and a small portion of two others in the 160-lot Ridgewood subdivision in the Town of Irondequoit.

In order to complete the sale to Wegman, plaintiffs are required to extinguish the restrictive covenants on their property by either securing the voluntary consent of the property owners and mortgagees within the Ridgewood subdivision or obtaining a court declaration extinguishing the covenants. Voluntary consent has been obtained from 65% of the owners of the remaining land and 14 of the 16 mortgagees of property within the tract. The remaining owners and two mortgagees were served with a summons and complaint. Only eight of these parties answered. Of these eight landowners, only four appeared at trial, and one of these owners subsequently moved to Florida. Accordingly, there are three property owners who remain as defendants.

The land which comprises the Ridgewood subdivision was acquired by George Bumpus in 1916. The tract was divided into 160 lots and extended over an area approximately 964 by 1,300 feet. In 1920 Bumpus and his wife began conveying the lots subject to the following restrictive covenants:

"That the premises above described shall be used for residential purposes only; that no flat, apartment house or double house shall be erected thereon, but only a single residence to cost at least four thousand dollars ($4,000) on lots fronting on Woodman and Ridge Roads, and to cost at least three thousand dollars ($3,000) on all other lots. That no liquor shall be made or sold on said premises; that no sand or gravel shall be removed or sold from the said premises.

"That no building shall be erected less than sixty feet distant from the front line of lots fronting on Ridge Road or less than fifty feet on all other lots. That all of said covenants and restrictions shall run with the land".

When the first six of the plaintiff school district's lots were conveyed in 1925, no restrictive covenants were placed upon them. When the rest of the lots now owned by the school district were acquired between 1922 and 1956,

the restrictive covenants were placed in the deeds. At the present time, buildings which formerly housed Ridgewood Junior High School are located on the property owned by the plaintiff school district. The school was closed in 1977, however, due to declining enrollment and has not been used for any purpose since that time. The school district has continued to pay the costs of maintaining the property including insurance and utility costs.

Plaintiff Meitzler's land was acquired in 1947 subject to the restrictive covenants. It was used for residential purposes but is presently not in use because of two fires.

Plaintiffs contend that there has been a substantial change in circumstances which warrants the removal of the deed restrictions.

When the map of the Ridgewood subdivision was filed in 1916, the property was bounded on the south by Ridge Road, on the east by Attleboro Road, on the west by Woodman Road and on the north by a property line north of Worthington Road. At that time, the entire Town of Irondequoit consisted primarily of farmland. The land now owned by plaintiffs was a gravel pit used for mining operations. The property south of Ridge Road, directly across from the subdivision, was used as a baseball diamond. The town historian testified, without giving a specific date, that a firehouse was located on the southwest corner of the subdivision. As early as 1931, the intersection of Woodman and Ridge Roads was somewhat commercial in nature. The leading area bar, Forest House, was located on this corner, just south of the subdivision. By 1950, the subdivision itself was almost totally developed as single-family, owner-occupied houses and all of the buildings which fronted on Ridge Road but one were residential.

At the time of trial, it was established that there was only one residence on the subdivision lots fronting Ridge Road. A public library was located on the three lots directly next to the plaintiffs' property, and the Irondequoit Historical Society was located on the lot next to the library. A beauty parlor with two apartments was where the firehouse formerly stood. Woodman Road which formed the western border of the tract was renamed Culver Road and

was widened to accommodate increased traffic. Ridge Road, which formed the southern border of the subdivision, was a four- to six-lane highway servicing heavy local traffic. Monroe County's outer loop, then Route 47, ran one-quarter mile east of the subdivision. The area surrounding the subdivision was highly commercialized. A gas station and car wash was where the Forest House formerly stood. The property across from Ridge Road, formerly the baseball diamond, was the site of the Culver Ridge Shopping Center which constituted 28 stores. Next to this shopping center was additional commercial property, including a gas station, professional offices, insurance offices and banking facilities. On the northwest corner of Culver and Ridge Roads was an ice cream store and a Kentucky Fried Chicken Restaurant. Eastridge High School was located directly to the east of the land on which the vacant junior high school was located. The school grounds were joined by land which was dedicated as Attleboro Road but which was undeveloped and used for school purposes.

Subsequent to the decision to close the junior high school in 1977, the plaintiff school district attempted to find a buyer for the property. A number of prospective buyers inspected the property, but Wegman's offer for $525,000, which is slightly less than the school district's bonded indebtedness of $585,000, was the only one received by the school district.

Prospective buyers inspected the property for possible conversion to apartments, offices, stores, health-related facilities and light industrial uses, but no offers were made to convert the property to single-family homes. Plaintiffs' expert testimony established that approximately 14 houses could be built on the plaintiffs' property at a cost of approximately $133,000 or $140,000 per house. The experts testified that, even if the school district gave its land away,* houses would cost more than $80,000-$90,000 to build and could not reasonably be expected to sell. The average selling price for houses within the subdivision which were sold within the last few years was $38,000. One of the

---

* However, section 1 of article VIII of the New York State Constitution prohibits school districts from giving away property.

school district's experts testified that the construction of a Wegman Supermarket would not have an adverse impact on adjoining properties based upon a study of property sales adjoining the Culver Ridge Shopping Center and those removed from it. He further testified that some people will pay more for a location which is nearby a supermarket.

Defendants' expert testified that, in his opinion, a Wegman Supermarket would cause a diminution in value of the property of the defendant who was located closest to the proposed supermarket site. He did not testify as to the extent of the diminution or the basis for this opinion. He admitted, however, that the vacant school was in a state of disrepair and also was causing a diminution in value to the nearby property.

Defendants' expert further testified that, in order to be consistent with the rest of the area, residential houses would have to be priced in the $60,000 range. He did not testify as to the feasibility of residential development but later admitted that his cost analysis assumed that street improvements were in existence and that plaintiffs would incur the cost of demolition of the existing buildings and preparation of the land for residential use.

Wegman's site plan, which was approved by the town planning board, shows efforts to minimize the impact of its operations on nearby residential properties. The plan includes extensive landscaping, screening and buffering of the proposed site and a retaining wall constructed 23 feet from the property line on Abington Road. The plan also includes grading the property so that the entire site would be out of the view of the residential portion of the subdivision. The plan further includes a completely enclosed compactor for the storage of refuse and an enclosed loading area for deliveries.

Two of the three remaining defendants who opposed extinguishing the covenants did not testify at trial. The one defendant who did testify expressed concern over the possibility of noise, rats and broken bottles. He indicated, however, that he was not familiar with Wegman's operations and did not know that the loading area and refuse

storage were completely enclosed. He testified that he was concerned for the safety of the neighborhood children with the increased traffic.

The trial court dismissed the complaint to extinguish the covenants on the basis that they were not valueless to the defendants in that they had prevented commercial encroachment into the subdivision. The trial court also found that plaintiffs failed to prove that the character of the neighborhood had changed so as to defeat the object and purposes for which the restrictions were imposed.

RPAPL 1951 (subd 2) authorizes a court in any action seeking relief against a restrictive covenant or a declaration with respect to its enforceability to extinguish the covenant "if the court shall find that the restriction is of no actual and substantial benefit to the persons seeking its enforcement or seeking a declaration or determination of its enforceability, either because the purpose of the restriction has already been accomplished or, by reason of changed conditions or other cause, its purpose is not capable of accomplishment, or for any other reason". This subdivision also provides for payment to the person or persons who would otherwise be entitled to enforce the covenant in the event of a breach of such damages as such person or persons will sustain from the extinguishment.

Although the language of the statute permits courts to extinguish a restriction when it is found to be of "no actual and substantial benefit", courts have required that the covenant be valueless to the party seeking its enforcement when extinguishment is sought on the basis of changed conditions (see *Grossbaum v Dil-Hill Realty Corp.,* 58 AD2d 593; *Clintwood Manor v Adams,* 29 AD2d 278, affd on opn below 24 NY2d 759). In *Clintwood Manor v Adams* (*supra,* p 279) this court stated, "The problem is basically one of balancing the equities * * * 'Equity may refuse to enforce a restrictive covenant upon the ground of change of conditions only where it is established that the change is such that the restriction has become valueless to the property'" of the party seeking to enforce it and onerous to the property to which the covenant applies (see, also, *Cummins v Colgate Props. Corp.,* 2 Misc 2d 301, affd 2 AD2d 749).

However, in *Orange & Rockland Utilities v Philwold Estates* (52 NY2d 253), the Court of Appeals emphasized that the determination of the enforceability of restrictive covenants involves a balancing of relative hardships. The court stated (p 266), "The issue is not whether [the party seeking to enforce the covenant] obtains *any* benefit from the existence of the restriction but whether in a balancing of equities it can be said to be, in the wording of the statute, 'of *no* actual and *substantial benefit*'".

In *Orange & Rockland Utilities v Philwold Estates* (*supra*) the plaintiffs sought removal of a covenant which restricted the use of the land to the erection of a hydroelectric plant on the basis of changed conditions. The defendant opposed extinguishing the restrictive covenant because he had exclusive hunting and fishing rights over the property and argued that the value of these rights was enhanced by the covenant and that the covenant kept the property near to his unspoiled. In balancing the equities, the Court of Appeals stated (*supra,* p 265) that the foremost factor to be considered was that the enforcement of the covenant would render the land useless because the city had condemned the riparian rights of Rockland Light & Power Company (plaintiff Orange & Rockland Utilities' predecessor). The court stated (p 265) that the wording of the statute provided for extinguishment when "'by reason of changed conditions or other cause, its purpose is not capable of accomplishment, or *for any other reason*'" and concluded that the impossibility of constructing a hydroelectric plant was sufficient to trigger the power of extinguishment if that appeared to be the equitable course.

In light of the statutory language which authorizes extinguishing covenants which are of "no actual and substantial value" and the recent clarification by the Court of Appeals to the effect that the test is not whether the party seeking enforcement receives any benefit, we cannot refuse to extinguish these restrictive covenants because they are not totally valueless to defendants. We agree that if the restrictions are found to be valueless to the party seeking to enforce them, the restrictions should be extinguished. However, such a finding is not a prerequisite to extinguishing restrictive covenants. Furthermore, such an in-

terpretation would negate the statutory provision for payment of damages to the party seeking to enforce the covenant to the extent that that party is harmed. If the valueless standard were applied in every instance, there would never be an award of damages and this statutory language would be superfluous.

Therefore, our inquiry entails a balancing of the equities and a determination of whether the restrictive covenants are of no actual and substantial value to defendants.

The first and foremost factor to be considered is whether the property is capable of being put to the use required by the restrictions (see *Orange & Rockland Utilities v Philwold Estates, supra*). As to the residential restriction, plaintiffs' experts testified that, due to the cost of demolition of the pre-existing buildings and the cost of preparing the land for residential use, houses constructed on the property would be unmarketable. Houses could be built at a cost of over $100,000 per house. However, the average selling price of a house within the tract was $38,000, and one of plaintiffs' experts testified that, in order to sell, the price of a house on the plaintiffs' property would have to be under $54,000. The property, although capable of being used as residential, cannot practically or reasonably be converted to that use without the plaintiff school district incurring extensive losses.

It is obvious from the record that the restrictive covenant which requires that the land be used for residential purposes has imposed an onerous burden on plaintiff school district. No offers to purchase the land for residential development were received after continuous marketing efforts. Expert testimony established that residential development was not a feasible or viable use for the property.

The decline in enrollment which necessitated the closing of the school occurred through no fault of the plaintiff school district. Defendants argue that the hardship is the self-created result of a political decision which could have been avoided had the school district closed a different school. We cannot, however, review a decision involving the exercise of professional judgment in a school matter (see *Matter of Foster v Saylor*, 85 AD2d 876); it may only be

reviewed by the Commissioner of Education pursuant to section 310 of the Education Law. The school was originally located on unrestricted land and expanded onto restricted land without objection in the 1950's. The use made of the property by the school district itself violated the covenant restricting the use to single-family residences. Clearly, under these circumstances, the school district cannot be charged with creating the hardship from which it seeks relief.

We turn now to the issue of whether this restrictive covenant is of no actual and substantial value to the defendants. Defendants contend that the covenant has precluded commercial exploitation of the subdivision. While it is true that the subdivision itself has not become commercialized, with only one commercial development and a driveway leading to the gas station and car wash outside of the subdivision, the surrounding area is now highly commercial. Directly across from the subdivision is the Culver Ridge Shopping Center, a 28-store complex. Adjacent to this complex are professional offices, a gas station and banking facilities. An ice cream store and a Kentucky Fried Chicken Restaurant border the subdivision on the southwest. Ridge Road, which borders the subdivision on the south, was formerly 50 feet wide and is now a four- to six-lane highway. Monroe County's outer loop, which replaced a dirt road, is only one-quarter mile east of the subdivision.

Although there has been only slight commercial development within the subdivision, this restrictive covenant has not been strictly followed. Only one residential lot remains in the area of the proposed Wegman's site which fronts Ridge Road. The school, public library and historical building all violate both the letter and the spirit of the covenant, as do the beauty shop and apartments on the southwest corner of the subdivision, also fronting Ridge Road.

This court has refused to enforce a residential restrictive covenant in the past under similar circumstances. In *Uvanni v CMB Bldrs.* (41 AD2d 1019), plaintiffs and defendant owned adjoining lots in a subdivision consisting of 298 lots encumbered by a covenant made in 1914 restricting

the lots to residential purposes only. Although the tract itself had remained substantially residential, the surrounding area had become highly commercialized with a large shopping center directly across the street and a major arterial highway running along one border of the subdivision. The subject property adjoined this highway. Other lots within the subdivision which adjoined the major highway had undergone a change in character and evidence was introduced tending to show that defendant's lot was not suitable for residential purposes. Similarly, the area surrounding the Ridgewood subdivision is highly commercialized, plaintiffs' property is not suitable for residential purposes and all of the lots but one which front Ridge Road are nonresidential in character.

Additionally, defendants argue that the proposed use of the lots will diminish the value of their property. Defendants' expert offered only general opinion evidence on the issue of the diminution of value which would be caused by extinguishing the residential restrictive covenant. Such general opinion evidence presents nothing from which the importance or substantiality of the benefit can be measured (*Orange & Rockland Utilities v Philwold Estates,* 52 NY2d 253, *supra; Koch v Nestle,* 27 AD2d 633). Defendants' expert also testified that the vacant and deteriorating school buildings were diminishing the value of the surrounding property. Furthermore, six of plaintiff school district's lots are unencumbered by the restriction and could be developed commercially, in any manner, regardless of the covenants on the remaining lots.

The fact that almost all of the property owners voluntarily released their rights can be considered evidence that they did not believe that the restrictions were of substantial benefit (see *Clintwood Manor v Adams,* 29 AD2d 278, *supra*). Sixty-five per cent of the property owners executed voluntary releases. Most of the remaining property owners failed to appear and had a default judgment entered against them, leaving only three of the approximately 140 property owners remaining as parties to this action.

In balancing the equities, we conclude that enforcing the residential restriction will impose great hardship on the plaintiffs who have already incurred expenses in main-

taining vacant buildings which they are unable to sell under the restriction of the covenant. Although this covenant may have inhibited commercial development in the subdivision, measured against the burden to plaintiffs of maintaining land of which no residential use can be made, we hold that the value of this covenant to defendants is not substantial (see *Orange & Rockland Utilities v Philwold Estates, supra,* p 266). Furthermore, the surrounding area has become so commercial in character that the restrictive covenant serves little purpose as to the lots fronting Ridge Road. It is extremely unlikely that this property will ever be converted to single-family residences, the only use permitted by the restrictive covenant, since the area fronting Ridge Road is becoming increasingly commercial in nature and unsuitable for residential development.

Although we hold that the residential restriction is, therefore, extinguished insofar as plaintiffs' lots are concerned, there is no evidence that the character of the subdivision north of these lots has changed, and this decision is not to be interpreted as authority for further encroachment of the covenants (*Uvanni v CMB Bldrs.,* 41 AD2d 1019, *supra*). The burden of showing the covenant is of no actual and substantial value is on the party attacking it and it is not a light one (*Uvanni v CMB Bldrs., supra; Normus Realty Corp. v Disque,* 20 AD2d 277, 280, affd 16 NY2d 912).

Plaintiffs' complaint also seeks to extinguish the remaining covenants. There is no need to extinguish the restriction against the removal or sale of sand and gravel, as this restriction permits normal building excavation. The record contains no proof that the remaining restrictive covenants are an onerous burden to plaintiffs and of no actual and substantial value to defendants; therefore, these restrictions remain intact.

Defendants contend that this matter should be remitted to the trial court for a determination of damages if the restrictive covenants are extinguished. As already noted, defendants were afforded an opportunity to present proof as to the damages they would suffer as a result of the extinguishment of the restrictive covenants but failed to establish damages in quantifiable terms. They are, there-

fore, barred from seeking damages at this time (see *Orange & Rockland Utilities v Philwold Estates,* 52 NY2d 253, 267, *supra*).

Accordingly, the judgment should be modified so that it declares the restrictive covenant which requires that the land be used for residential purposes extinguished.

SIMONS, J. P., CALLAHAN and DOERR, JJ., concur.

Judgment unanimously modified, and as modified affirmed, without costs in accordance with opinion by MOULE, J.